IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MOHAMMED ZAKARIA MEMON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-09-2766 |
| | § | |
| DELOITTE CONSULTING, LLP,  *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND ORDER**

Mohammed Zakaria Memon, a naturalized American citizen born in Pakistan, has sued his former employer, Deloitte Consulting, LLP, alleging that he was subject to unfair treatment and then fired because of discrimination on the basis of his race and his religion (Muslim).  He also alleges that he was retaliated against for complaining about the discrimination.  After discovery, Deloitte moved for summary judgment. (Docket Entry No. 30).  Memon responded, (Docket Entry No. 33); Deloitte replied, (Docket Entry No. 36); and Memon filed a surreply, (Docket Entry No. 38).  Based on the record; the motion, response, reply, and surreply; and the applicable law, this court denies Deloitte's motion for summary judgment, for the reasons explained below.  A status and scheduling conference is set for **April 8, 2011** at 8:30 a.m.

I.     **Background**

The factual background is drawn from the extensive summary judgment record.[1]  Memon

---

[1]     The summary judgment record includes the affidavit of Anthony Perroni, a Deloitte principal and the person responsible for firing Memon, (Docket Entry No. 30, Ex. A); Deloitte security badge records for the Houston office showing how often Memon was present at that office during certain periods, (*id.*, Ex. A.1); Memon's May 12, 2008 separation memorandum, (*id.*, Ex. A.2); the affidavit of David Furgason, the Deloitte consultant who oversaw Memon's work on the Wal-Mart PROFIT project in Arkansas, (*id.*, Ex. B); an e-mail chain ending with Furgason's November 16, 2007 e-mail to Paul McGovern, a Deloitte principal who oversaw the PROFIT project, (*id.*, Ex. B.1; Docket Entry No. 33, Ex. 10); Memon's evaluation from the PROFIT project, (Docket Entry No. 30, Ex. B.2); an e-mail chain ending with Furgason's January 31, 2008 e-mail to Hrishi Vyasa, a Deloitte employee who worked on the PROFIT project (*id.*, Ex.

testified in his deposition about his regular religious observance.[2]  Memon prays five times each day at appointed times.  These prayers last approximately five minutes.  Memon also performs a ritual cleansing, known as Wazu, before prayer.  The cleansing is sometimes referred to as "wudhu" in the deposition transcripts.  Memon explained in his deposition that he must wash his face, wash his hands and arms up to his elbows, rub his hair with his wet hands, and wash his feet up to his ankles, but he need not remove clothing.  (Docket Entry No. 33 at 13–15).  Memon wears a long beard as part of his religious practice.

Memon began his career as an SAP professional in May 1997.  SAP is an enterprise-management software that many businesses use to make their operations more efficient.  Memon worked for different companies, sometimes as an employee and other times as an independent contractor.  He was not fired from any position before he worked at Deloitte.

---

B.3); an e-mail chain ending with an e-mail from Conrad Mishan, a consultant who worked on the PROFIT project dated February 7, 2008, sent to Furgason, (*id.*, Ex. B.4); a January 9, 2008 e-mail from Wal-Mart's Allan Stone to Deloitte's Furgason, (*id.*, Ex. B.5); the affidavit of Rhonda Shively, a Deloitte human resources employee, (*id.*, Ex. C); a slide presentation entitled "Deloitte Consulting LLP: Overview," (*id.*, Ex. C.1); Deloitte's Equal Employment Opportunity Policy, (*id.*, Ex. C.2); the job description for Memon's job, (*id.*, Ex. C.3); excerpts from Deloitte's Operating Guidelines and Expectations, (*id.*, Ex. C.4); a slide presentation called "The Staffing Process Framework," (*id.*, Ex. C.5);  the affidavit of Susan Sparkman, a Deloitte employee assigned to assist Memon in finding assigments, (Docket Entry No. 30, Ex. E); an April 16, 2008 e-mail exchange between Memon and Sparkman, (*id.*, Ex. E.1); the deposition of David Furgason, Memon's supervisor on the Wal-Mart PROFIT project, (*id.*, Ex. F (excerpts); Docket Entry No. 33, Ex. 4 (entire deposition)); the affidavit of Allan Stone, a Wal-Mart employee who was Furgason's counterpart on the PROFIT project, (Docket Entry No. 30, Ex. G); a December 5, 2007 e-mail exchange between Stone and another Wal-Mart employee, John Owen, (*id.*, Ex. G.1); the deposition of Paul McGovern, a principal at Deloitte who oversaw the PROFIT project, (*id.*, Ex. H; Docket Entry No. 33, Ex. 5); Memon's EEOC discrimination charge, (Docket Entry No. 30, Ex. I); Memon's EEOC right-to-sue letter, (*id.*, Ex. J); Memon's resume, (Docket Entry No. 33, Ex. 1); Memon's evaluation from his first project with Deloitte, at Lockheed Martin, (*id.*, Ex. 3); an interview evaluation from Memon's hiring, (*id.*, Ex. 6); Sparkman's May 7, 2008 e-mail to Perroni, (*id.*, Ex. 7); a "tipsheet" on Deloitte employee evaluations, (*id.*, Ex. 8); Furgason's January 28, 2008 e-mail to Sparkman, (*id.*, Ex. 9); Shively's March 3, 2008 e-mail to Perroni, (*id.*, Ex. 12); Deloitte lawyer Shari Fallek Coats's February 24, 2009 letter to an EEOC investigator, Joe Lara, (*id.*, Ex. 13); a transcript of the February 1, 2008 phone call in which Memon learned he would be rolled off the PROFIT project, (*id.*, Ex. 14); Deloitte's response to Memon's interrogatory number seven, (*id.*, Ex. 15); the affidavit of Sara C. Longtain, one of Deloitte's attorneys, (Docket Entry No. 36, Ex. O); and Memon's First Supplemental Responses and Objections to Deloitte's first set of interrogatories, (*id.*, Ex. P).

[2]  Excerpts of Memon's deposition are at Docket Entry No. 30, Ex. D; the entire deposition transcript is at Docket Entry No. 33, Ex. 2.

Memon interviewed with Deloitte for a job as a consultant in the summer of 2007. One interviewer concluded as follows:

> [Memon] comes across as a very personable consultant. He has a deep desire to support clients and be engaged in problem solving. He would definitely fit in the Specialist Path and would recommend a Lead position. A senior specialist level was indicated on the Candidate Summary Form. *Whilst that may be appropriate to allow time to develop Deloitte Consulting Network and Deloitte Consulting Toolset I would be concerned that his level would be higher.*

(Docket Entry No. 33, Ex. 6 (emphasis in original)).

Deloitte hired Memon to work in the Houston office as part of the Enterprise Applications Group beginning on August 13, 2007. As a lead consultant, Memon's salary was $138,000 per year plus benefits. (Docket Entry No. 30, Ex. C, ¶¶ 3–4). Anthony Perroni, a Deloitte principal, was assigned as Memon's counselor, which involved giving career advice and reviewing Memon's performance with him. (*Id.*, Ex. A, ¶ 2). Susan Sparkman, a Dallas-based human resources employee, was in charge of assigning Memon to specific projects. (Docket Entry No. 33 at 85).

Memon's first assignment was with Lockheed Martin and ran from August 20 to September 21. (Docket Entry No. 33, Ex. 3). He received a generally positive evaluation on a form called a Project Development Assessment. (*Id.*). Under "Strengths," his supervisor listed "Collaborative demeanor" and "Good background and experience." (*Id.*). Under "Development Opportunities," the supervisor listed "Focus on follow through," "Focus on planning and scheduling his work to meet deliverables," and "Continue to work on presentation skills." (*Id.*). The Project Development Assessment noted that Memon had "achieved [his] Goals" and rated him at a level 3, meaning that he met expectations. (*Id.*). In the narrative portion of the Assessment, Memon's supervisor wrote, "Mohammed has a strong understanding of the SAP product. He needs to focus on improving his communication, facilitation and team work skills. Thank you for all your hard work on the LM Aero

3

D2 project." (*Id.*).

After the Lockheed Martin project, Memon spent approximately one month "on the bench," Deloitte's term for periods when a consultant is not assigned to a project. Deloitte's written policy states that employees on the bench are expected to be in the office doing self-training or participating in training activities, networking with supervisors, and engaging in local office initiatives, among other tasks. (Docket Entry No. 30, Ex. C-5). Memon testified that he rarely went into the Houston office while he was on the bench, because he found there was nothing there for him to do. (Docket Entry No. 33, Ex. 2 at 61). He asserts that no one complained to him about his absences while he was on the bench after the Lockheed Martin project ended. (*Id.* at 339). Memon was at his home in Sugar Land, Texas when he received word about his next assignment at Wal-Mart's Bentonville, Arkansas headquarters.

Memon worked on the "PROFIT" project at Wal-Mart headquarters in Bentonville beginning in early November 2007. The project's goal was to improve Wal-Mart's procurement programs for nonretail items. Memon worked on the computer aspects. (Docket Entry No. 33, Ex. 2 at 125). David Furgason was Memon's direct Deloitte supervisor on the project; Allan Stone, Wal-Mart's Director of Profit Enterprise Asset Management, was Wal-Mart's primary manager.

Memon worked on the PROFIT project until February 1, 2008. Memon alleges that he was "rolled off"—Deloitte's term for a reassignment—because of his Muslim faith. Furgason asserts that he removed Memon from the project because of poor performance.

It is unclear whether Memon was a "team lead" or a "team member" when he began working on the PROFIT project. Memon was initially asked to lead workshops with Wal-Mart personnel to determine the company's requirements. Memon testified that he led two or two-and-a-half workshops in November, after which Furgason placed him in a support role. (Docket Entry No. 33,

Ex. 2 at 360–61).  In that role, Memon and another consultant took notes while Conrad Mishan, a London-based Deloitte consultant working on the project, led the meetings.  (*Id.*).  Memon argues in his response to Deloitte's summary judgment motion that he was demoted from team lead to team member, but in his deposition he denied that he was ever the team lead.  (Docket Entry No. 33, Ex. 2 at 157).  A March 3, 2008 e-mail from Rhonda Shively, a Deloitte human resources employee, to Perroni, the Houston Deloitte principal assigned to be Memon's counselor, characterized the change in duties on the PROFIT project as a "demotion from team lead to team member."  (Docket Entry No. 33, Ex. 2 at 16).  It is unclear, however, that there was any change in Memon's duties other than no longer leading the workshop meetings.

While at Wal-Mart, Memon continued his daily prayers and Wazu.  He performed the cleansing in a Wal-Mart corporate headquarters office bathroom and the prayers in various places around the office building.  Furgason testified that he noticed that Memon arrived at work later and left earlier than his coworkers on the PROFIT project and asked for an explanation of the arrival and departure times.  (Docket Entry No. 30, Ex. F. at 32).  Memon told Furgason that he had to pray.  (*Id.* at 32–33).  Furgason did not know that Memon was a devout Muslim before Memon arrived in Arkansas.  (Docket Entry No. 30, Ex. F at 32).  Before working with Memon, Furgason "ha[d] not worked with a . . . man or woman who is a Muslim and did not understand, did not know the prayer requirements."  (*Id.* at 32).  Furgason testified that he "was concerned about learning what the practice was and trying to address it with [Memon to] make accommodations for him and for that practice."  (*Id.*).  Furgason testified he and Memon had a mid-November meeting at which they agreed that Memon could arrive late and leave early to perform his prayers.  (*Id.* at 34).

Furgason asserts that during this time, he concluded that Memon was not ready to lead the workshops.  (Docket Entry No. 30, Ex. F. at 30, 36).  On November 14, Paul McGovern, a Deloitte

principal, had written to Furgason proposing adding another Deloitte consultant, Mohanon Menon, to the PROFIT team.  (Docket Entry No. 30, Ex. B.1).  Furgason responded that he had already concluded he would "likely . . . have to make some changes to the current procurement team structure."  (*Id.*).  In an e-mail sent later that same day, Furgason told McGovern that Memon was "not the strong lead I had hoped he would be."  (*Id.*).  Early the next morning, McGovern asked Furgason in an e-mail if Memon, referred to as "MZ," was "a keeper as a team member."  (*Id.*).  Furgason responded:

> MZ is a keeper from the team member perspective, but he is not a keeper for the team lead role.  He does not have interpersonal skills required of a team lead, does not have the presence of a team lead, but is a good hands-on-keyboard type which is consistent with his pre-Deloitte Independent experience.
>
> I am going to have a talk with him regarding his adherence to work hours and the fact that while I respect his religion, I have to be respectful of the client and our work hours.  He is a Muslim and goes to prayer multiple times per day on site as well as before and after work . . . . this is one of the stickier situations I have had and would look for your advice and counsel.

(Docket Entry No. 33, Ex. 10).  McGovern answered late that night: "Respect his []religion, coac[h] him and find someone else to be the lead."  (*Id.*).  Another consultant, Hrishi Vyasa, was designated as the "lead."  (Docket Entry No. 30, Ex. F. at 54).

A few weeks later, in early December, Allan Stone, the Wal-Mart employee who supervised the PROFIT project in Arkansas, and another Wal-Mart employee, were surveying office space for the project when they encountered Memon performing his prayers.  (Docket Entry No. 30, Ex. G, ¶¶ 2–3).  Stone testified that the office space Memon was using was intended for use on the project and that Memon would have to find another place to pray.  On December 5, Memon was given a different onsite location to perform his prayers.   (*Id.*, ¶ 3; Docket Entry No. 33, Ex. 2 at 301).

6

Later in December, McGovern received a call from Derek Martin, Wal-Mart's Director of Finance, about Memon.  (Docket Entry No. 30, Ex. H at 18).  Martin told McGovern that a Wal-Mart employee had observed a Deloitte employee, later determined to be Memon, in "a state of undress" in a Wal-Mart office bathroom.  It is unclear what the Wal-Mart employee meant by the description, Memon testified that he does not undress to perform Wazu.  (Docket Entry No. 33, Ex. 2 at 350).  McGovern did not seek clarification or do any investigation.  (Docket Entry No. 30, Ex. H at 20).  Instead, he directed Furgason, who was on vacation, to address the situation when he returned to Bentonville.  McGovern suggested that having Memon go back to the hotel to perform Wazu would be appropriate.  (*Id.* at 20–21).  Furgason testified that when he came back from vacation, he told Memon that being undressed in Wal-Mart's bathrooms was unacceptable.  Furgason testified that although he did not forbid Memon from using the Wal-Mart bathrooms to perform Wazu, he suggested that Memon return to the hotel as an alternative.  (Docket Entry No. 30, Ex. F at 44–45).

Memon's account is different.  Memon agrees that Wal-Mart employees found him praying in an office, but contends the encounter took place in late November.  At the time, Memon felt that the request that he pray in a different location was acceptable, though not his preference.  (Docket Entry No. 33, Ex. 2 at 302).  Memon testified that he had only one conversation with Furgason about his religious practices and that occurred in late November, not in December.  Memon denies that Furgason told him about a report that he was "in a state of undress" in a Wal-Mart bathroom.  According to Memon, Furgason  told him he could not perform Wazu in the Wal-Mart bathrooms.  Memon concedes that Furgason told him he could go back to the hotel to perform Wazu.  Memon claims that this arrangement was problematic for two reasons.  First, he understood that Deloitte policy required him to obtain written note to leave work during the day.  On one occasion, Memon

7

contends that Hrishi Vyasa said that he should not go to the hotel during the day without written permission.  (*Id.* at 362–63).  Memon also faulted the arrangement because it required him to be away from work too long.  Memon testified that going to the hotel and back would have required about an hour, significantly reducing his ability to contribute to the project.  For that reason, he asserts, he went to the hotel to perform Wazu only once.  The rest of the time he performed Wazu at a nearby barbecue restaurant and prayed in its parking lot.  Memon concedes that no one required him to pray in the parking lot.  He did so because once he was at the restaurant to perform Wazu, it was easier to pray there as well.  (*Id.* at 150–51, 308–09).

According to Deloitte and Wal-Mart employees, Memon performed poorly on the PROFIT project during this period.  Furgason and his Wal-Mart counterpart, Stone, assert that Memon had difficulties in communicating and in understanding Wal-Mart's goals on the PROFIT project.  (Docket Entry No. 30, Exs. F, G).  Stone testified that he attended a January 9 workshop in which Memon failed to provide the Wal-Mart employees the "knowledge they needed."  Memon appeared unprepared and scheduled workshops "inefficien[tly]."  Stone reported to Furgason the same day that Conrad Mishan, the London-based Deloitte consultant, "had to step in and was head and shoulders above" Memon and another consultant.  Stone wrote of Memon and the other consultant, "The more I see of both of them, the less I like their knowledge of SAP and leadership abilities . . . ."  (Docket Entry No. 30, Ex. B-5).  Stone asked Furgason to have someone other than Memon lead the workshops.

Mishan also faulted Memon's ability to produce slides for a presentation shortly afterward.  On January 10, Mishan e-mailed Memon, asking to see the slides when they were complete.  (Docket Entry No. 33, Ex. B.4).  Memon sent the slides the next day and invited Mishan to review them and change them if necessary.  (*Id.*).  Mishan responded the next day that he "was expecting

8

more than this." Mishan requested certain changes and told Memon that he "would like to review this by 12 today" and to "please let me know if this is a problem." Memon sent updated slides the next day at 5:07 a.m. On February 7, after Memon had been rolled off the PROFIT project, Mishan sent the slides to Furgason. He wrote, "After 2 days worth of work, 2–3 hours of my briefing and the bullet points below, MZ produced these slides half a day late. In the end I did the slides myself." (*Id.*). Memon asserts that he did not turn the slides in late and that the problem was Mishan's idiosyncratic preferences, not his own failure to perform. Memon also contends that Mishan generally treated him badly. Memon testified that Mishan called him "dog." Memon also claims that Mishan was overly critical of his work and made him drive Mishan around Bentonville. (Docket Entry No. 33, Ex. 2 at 260–69). Memon did not tell anyone at Deloitte, including Furgason, about his problems with Mishan. (*Id.* at 268–69).

Eventually, Furgason decided to remove Memon from the PROFIT team. On January 28, Furgason e-mailed Sparkman seeking advice on how to remove Memon from the project. Furgason wrote:

> MZ Memon has been a member of the Wal-Mart Procure to Pay Team to date. I need to remove him from the project due to unacceptable performance at this point in the project. Can you advise me on the steps that I need to take with you to remove MZ? Mohanan Menon will take MZ's place for now.

(Docket Entry No. 33, Ex. 9). By January 31, Deloitte was ready to move forward on Memon's removal from the PROFIT project. McGovern sent the following e-mail to Perroni, Sparkman, and one other Deloitte employee:

> Hrishi [Vyasa] and I will deliver the message to MZ today. Included in that message is the expectation that <u>today is his last day</u> on the Wal-Mart PROFIT project.
>
> I believe the development areas are points that MZ can work on and

9

> will continue with Deloitte: he has regrettably burned through his welcome at WM.  These are also the points that I will include in MZ's PDA, if/when he submits one.
>
> On a separate topic, I have worked with MZ on how best to accomplish his prayer rituals.  I fully respect and admire his prayer rituals, but he also needs to understand that not all Americans understand his practices and he needs to be as sensitive to them as Wal-Mart has been to him.  This is an area that we have talked through and came to arrangements that did not compromise his prayers, did not cause concern to Wal-Mart Associates, but did have minimal impact on the project team.  We can discuss this as well this evening.

(*Id.*, Ex. 11).

Memon claims that he had no idea he was going to be rolled off the PROFIT project.  He found the development a "shock and surprise."  (Docket Entry No. 33, Ex. 2 at 176).  No one at Wal-Mart or Deloitte, Memon asserts, had told him he was having any performance problems.  (*Id.* at 163–64, 167–68).  Memon claims that just days before the roll off, Vyasa reported that Memon would replace him as the team leader because Vyasa found the commute difficult.  (*Id.* at 176).  Nevertheless, when Furgason sent an e-mail on February 1 to set up a phone call, Memon decided to record it.  Memon explains that the problems surrounding his prayer ritual made him believe something bad was about to happen.  (*Id.* at 171).

Memon was at home in Sugar Land, Texas the day of the call.  (*Id.* at 169).  Furgason was overseas.  (*Id.*).  Vyasa participated from Philadelphia, Pennsylvania.  (*Id.* at 170).  Furgason told Memon that he would be leaving the PROFIT project immediately, for performance reasons.  (Docket Entry No. 33, Ex. 14).  The tape recording of the phone call shows that in response, Memon told Furgason about his problems on the project:

> They made a great difficulty for me, you know.  And I used to go and wash off, you know, wudhu [inaudible] because I did not want to waste that much time to wait in the motel and come back you know.

10

(*Id.* at 9).  Furgason responded by telling Memon:

> washing has nothing to do with the situation. . . . [I]t is about the
> workshop and its about the — working within their teams.  And it is
> about the work products that are coming out.  And that is what this is
> about.  It is what I will put down officially.  And it is what I will also
> tell anyone else officially and unofficially, written and verbal.

(*Id.*).  Memon continued to emphasize his difficulties with Wal-Mart, telling Furgason that "the main

problem I see is that because they had a problem with me making a wudhu.  You know that was a

big problem.  (*Id.* at 11–12).  And in the back of my mind, I had the idea they're going to do

something like that."  Furgason responded, "[T]his has nothing to do with that.  That part I can

absolutely guarantee you."  (*Id.* at 12).

On the phone call, Furgason then cautioned Memon that many Americans were

uncomfortable with Islam and its rituals:

> I think you have to understand though, not only at this point but at
> others, for better or for worse, Americans don't understand certain
> things.  And Americans are totally freaked out by certain — you
> know, and there's no other way to put it.  Americans don't deal with
> certain things very well at all. . . . And you just have to understand
> that there are going to be clients, particularly in the south, that don't
> understand the situation.
>
> And when as explained to them, they are — while they appreciate it,
> they don't want to — because everyone is too concerned about —
> you know, Americans are far too concerned about having absolute
> privacy and absolute everything else.  They understand it, and they
> are willing to make accommodations for it but not at work.  And you
> need to — you need to under — you need to respect as much as they
> are.  You need to respect Americans don't see things the same way
> on certain things.
>
> [Memon]:        What do you mean?
>
> [Furgason]:      Because U.S. laws about stuff like that can come into
> conflict with what you're trying to do.  And you just really — on a
> very personal level, you need to be aware of what the law are

> [inaudible] that was offered up going back to the hotel and going
> back to a place of privacy.  Because the U.S. just doesn't do well
> with anything about that.  they just don't do well about it.
>
> . . .
>
> You have to also understand that when you do that, you're putting
> yourself at risk.

(*Id.* at 12–13).  Memon contends that these remarks were meant as a threat and show that Furgason was rolling him off the PROFIT project because of discrimination against his religion.

After his return to the bench in Deloitte's Houston office, Memon met with Perroni.  (Docket Entry No. 30, Ex. A, ¶6).  Perroni testified that he reminded Memon of his duties while on the bench, including the need to come to the office.  (*Id.*).  Memon disputes this account.  Memon denies that he and Perroni discussed the need to be in the office between assignments.  Memon testified that Sparkman told him that if he did not have work that required him to be in the office, he could work from home.  (Docket Entry No. 33, Ex. 2 at 61–62).  Memon felt that he could perform his job better at home because of a lack of personnel and space to work at the office.  (*Id.* at 181–82).  Memon testified that he went to the office when he needed to be there.  (*Id.*).  Memon did not remember how many times he went into the office, but testified that he was available by telephone from 8 a.m. to 8 p.m. "for any reason."  (*Id.* at 182).  Deloitte records show that Memon's security badge was scanned on only five days between February 1, 2008, when he rolled off the PROFIT project, and May 2.  (Docket Entry No. 30, Ex. A.1).

Memon testified that he called Sparkman several times a week after being rolled off to ask about his next assignment.  (*Id.* at 226).  Eventually, Memon contends, Sparkman told him that it was not necessary to continue calling.  (*Id.* at 228).  Sparkman's account conflicts with Memon's. Sparkman testified that she told Memon that he needed to be in the office.  (Docket Entry No. 30,

Ex. D).  Sparkman testified that she proposed at least four project assignments to Memon after the Wal-Mart project, but Memon declined all of them.  (*Id.* at 191–95).  Memon asserts that he declined the projects because he was not qualified to do the kind of work the projects required, not because he was unwilling.  (*Id.*).

Memon concedes that at least by April, Deloitte employees had made it clear that he needed to be in the office and not work from home.  On April 11, Shively, from human resources, met with Memon and told him that he needed to be in the Houston office.  (*Id.* at 209).  On April 16, Memon received an e-mail from Sparkman asking, "[A]re you working out of the Houston office? Remember, it is a requirement if you are unstaffed and available."  (Docket Entry No. 30, Ex. E.1). Memon responded, "Yes, . . . I am working out of the Houston office."  (*Id.*).  He added, "I am available any time."  (*Id.*).  Memon asserts that he did not understand the idiomatic phrase "out of the Houston office" to mean that he was physically in the office.  Instead, he thought it meant working "away from the office from your home.  That's what I understand . . . ."  (*Id.* at 198).

Memon testified that he complained about discrimination three times.  Memon first complained about religious discrimination to Furgason on February 1, when Furgason told him about the roll off from the PROFIT project.  Memon also told Perroni by telephone in early February that he believed he had been rolled off because of his prayers.  Memon made another complaint in an April phone call with Furgason, McGovern, and Shively.  (Docket Entry No. 33, Ex. 15).  After the second phone call, Shively began to investigate Memon's discrimination claim.  She met with Memon on April 30 and asked whether there were any witnesses to his discriminatory treatment on the PROFIT project.  (Docket Entry No. 30, Ex. 2 at 209).  Memon testified that he told Shively that he had proof he was discriminated against, but he did not want to get others involved.  (*Id.* at 210–11).  On May 7, Shively told Memon that he needed to give her names of people she could talk

to, or she would close the investigation. (*Id.* at 214). Memon never gave names of any witnesses to Shively. (*Id.*).

At the same time, Perroni contends that he became concerned about Memon's lack of attendance in the Houston office. On May 2, Perroni met with Memon about his extended absence. Perroni testified that Memon was dishonest about how often he was in the office. (Docket Entry No. 30, Ex. A, ¶ 8). Memon contends that he did not mislead Perroni about his attendance. (Docket Entry No. 33, Ex. 2 at 226–27).

Perroni testified that after the meeting, he concluded that Memon should be fired because of his bad performance, failure to attend work while on the bench, and dishonesty. (Docket Entry No. 30, Ex. A, ¶ 8). Perroni told Memon that he would be terminated on May 12. (*Id.*, ¶ 9). Memon's separation memorandum bears the same date. (*Id.*, Ex. A.2). The memorandum lists July 8 as the last day of Memon's employment at Deloitte and May 12 as the last day in the office. (*Id.*). The memorandum does not state the reasons for Memon's termination.

Memon filed a charge with the Equal Employment Opportunity Commission on May 13, 2008. (Docket Entry No. 30, Ex. I). Memon checked the boxes for discrimination based on religion and national origin and retaliation. (*Id.*). The charge reads:

> I began my employment as a Lead Consultant on or about 08/13/2005. On or about November 05, 2007 I was assigned to work on a project at Wal-Mart Corporate Office. On or about February 01, 2008 I was told I was being removed from the project by David Fergoson, Project Manager. He told me it was because of my performance. On or around February 01, 2008, I told David Fergoson and Hrishi Vyasa, Team Leader, that I felt like my Religion was the reason that I was removed from the project at Wal-Mart. Specifically, Wal-Mart had expressed a concern regarding my daily prayer practices, which had never been an issue at any previous assignment.
>
> On May 12, 2008, I was called into Tony Perroni's office and told

14

> that I was being terminated because of my performance.
> Performance was never an issue until I was removed from the project
> at Wal-Mart.
>
> I believe I have been discriminated against because of my Religion,
> Muslim, National Origin, Pakistani, and Retaliated against for my
> complaint about Religion being the reason for my removal from the
> Wal-Mart project, in violation of Title [V]II of the Civil Rights Act
> of 1964, as amended.

(*Id.*).  On June 25, the EEOC sent Memon a notice of right to sue.  (*Id.*, Ex. J).  Memon sued both

Deloitte and Wal-Mart but later dismissed his claims against Wal-Mart, with prejudice.

Memon asserted claims of national origin and religious discrimination and retaliation under

Title VII; retaliation under Title VII; racial discrimination under 42 U.S.C. § 1981; and state-law

negligence.  Deloitte moved for summary judgment on all claims.  (Docket Entry No. 30).  Memon

responded by abandoning his negligence and national-origin discrimination claims and stating that

he was asserting a race as well as a religious discrimination claim under Title VII.  (Docket Entry

No. 33 at 2 n.2, 19).  Deloitte's primary argument is that the only adverse action actionable under

§ 1981 or Title VII is the job termination.  Deloitte argues that the summary judgment record shows

that, as a matter of law, it fired Memon for poor performance.  Memon contends that genuine issues

of material fact preclude summary judgment.

Each argument is analyzed below.

## II.     The Legal Standards

### A.     Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the moving

party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).  "The movant bears the

burden of identifying those portions of the record it believes demonstrate the absence of a genuine

issue of material fact."  *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *See Celotex*, 477 U.S. at 325.  While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted).  "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted).  "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(a) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings.  The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007).  "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075).  In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

### B.    Racial and Religious Discrimination

Memon alleges discrimination based on race and religion.  He asserts his religious discrimination claim under Title VII, which makes it illegal to "discriminate against any individual

with respect to his compensation, terms, conditions, or privileges of employment, because . . . religion." 42 U.S.C. § 2000e-2(a)(2). He asserts his race discrimination claim under Title VII and 42 U.S.C. § 1981, which employ the same analysis. *Walker v. Geithner*, No. 10-10191, 2010 WL 4386747, at *1 (5th Cir. Nov. 4, 2010) (per curiam) (unpublished) (summary calendar) (citing *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 651 (5th Cir. 2004)); *Jackson v. Watkins*, 619 F.3d 463, 466 (5th Cir. 2010) (citing *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 281 n.7 (5th Cir. 2004)).

When a plaintiff attempts to prove discrimination through indirect or circumstantial evidence, the claims are considered under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), modified in *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003), and *Rachid v. Jack in the Box, Inc*., 376 F.3d 305 (5th Cir. 2004). Under the modified *McDonnell Douglas* approach, the plaintiff has the initial burden of making a *prima facie* showing of discrimination. *Abarca v. Metro. Transit Auth*., 404 F.3d 938, 941 (5th Cir. 2005); *Rachid,* 376 F.3d at 312. A plaintiff satisfies this burden by showing that: (1) he is a member of a protected group; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) he was treated differently from those outside the protected class. *See Frank v. Xerox Corp*., 347 F.3d 130, 137 (5th Cir. 2003); *see also Wheeler v. BL Dev. Corp.*, 415 F.3d 399, 405 (5th Cir. 2005) ("To establish a *prima facie* case of discrimination under § 1981, Appellants must establish that the: (1) are members of a protected group; (2) were qualified for the position held; (3) were discharged from the position; and (4) were replaced by persons outside of the protected group."). If a plaintiff makes a *prima facie* showing, the burden shifts to the defendant to articulate a "legitimate, nondiscriminatory reason" for the adverse employment decision. *Cullwell v. City of Fort Worth*, 468 F.3d 868, 873 (5th Cir. 2006). If a defendant can produce such evidence, the presumption of

17

discrimination dissolves. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142–43 (2000);

*Price v. Fed. Express Corp.*, 283 F.3d 715, 720 (5th Cir. 2002).  The plaintiff must then identify or

offer evidence to create a fact issue "either (1) that the defendant's reason is not true, but is instead

a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is

only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected

characteristic (mixed-motives alternative)." *Rachid*, 376 F.3d at 312 (internal quotation and

alteration marks omitted); *see also Cullwell*, 468 F.3d at 873; *Keelan v. Majesco Software, Inc.*, 407

F.3d 332, 341 (5th Cir. 2005) (analyzing a Title VII claim under the modified approach).  In a

mixed-motive case, if the plaintiff shows that the illegal discrimination was a motivating factor, the

defendant must respond with evidence that the same employment decision would have been made

regardless of discriminatory animus. *Rachid*, 376 F.3d at 312.  The plaintiff has the ultimate burden

of showing a genuine issue of material fact on whether the defendant discriminated against him on

the basis of the plaintiff's membership in the protected class. *Reeves*, 530 U.S. at 143.

Under Fifth Circuit precedent, "only ultimate employment decisions such as hiring, granting

leave, discharging, promoting, or compensating" qualify as adverse employment actions that may

be the basis for a discrimination claim. *McCoy v. City of Shreveport*, 492 F.3d 551, 559 (5th Cir.

2007) (quoting *Green v. Adm'rs of Tulane Educ. Fund*, 284 F.3d 642, 657 (5th Cir. 2002)).  The

Fifth Circuit has cautioned courts "not to expand the definition of adverse employment action to

include 'events such as disciplinary filings, supervisor's reprimands, and even poor performance by

the employee—anything that might jeopardize employment in the future.'" *Roberson v. Game

Stop/Babbage's*, 152 F. App'x 356, 360 (5th Cir. 2005) (per curiam) (unpublished) (quoting *Mattern

v. Eastman Kodak Co.*, 104 F.3d 702, 708 (5th Cir. 1997)); *see also Shackelford v. Deloitte &

Touche, LLP*, 190 F.3d 389, 407 (5th Cir. 1999) (maintaining that denying computer training to a

18

plaintiff who performed related duties occasionally is not an adverse employment action); *Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 708 (5th Cir. 1997) (stating that the alleged submission of unfair and biased employee evaluations is not an adverse employment action); *Dollis v. Rubin*, 77 F.3d 777, 779–82 (5th Cir. 1995) (holding that refusing to allow an employee to attend training sessions was not an adverse employment action).

### C.      Retaliation Under Title VII

Title VII makes it an unlawful employment practice for an employer to "discriminate against any of his employees . . . because he has opposed an unlawful employment practice under this subchapter." 42 U.S.C. § 2000e-3(a). The elements of a *prima facie* showing of retaliation under Title VII are that the plaintiff: "(1) engaged in an activity protected by Title VII; (2) he was subjected to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment action." *Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 319 (5th Cir. 2004). If a plaintiff makes a *prima facie* showing, the burden shifts to the defendant to proffer a legitimate nonretaliatory reason for the employment action. *Id.* If the defendant makes this showing, the burden shifts back to the plaintiff to demonstrate that the employer's articulated reason for the employment action was a pretext for retaliation. *Id.* The standard of proof on the causation element of a Title VII claim is that the adverse employment action taken against the plaintiff would not have occurred "but for" her protected conduct. *Septimus v. Univ. of Houston*, 399 F.3d 601, 608 (5th Cir. 2005); *Pineda v. United Parcel Serv., Inc.*, 360 F.3d 483, 487 (5th Cir. 2004).

Before the Supreme Court's decision in *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006), the Fifth Circuit applied the same standard for adverse employment actions for discrimination and retaliation claims under Title VII. *See McCoy*, 492 F.3d at 560. In

*Burlington*, the Supreme Court held that a broader set of actions could be the basis for a retaliation claim. The purpose of Title VII's retaliation prohibition is "preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the [Title VII's] basic guarantees." *Burlington*, 548 U.S. at 69. Thus, an adverse employment action for a retaliation claim is any action that a "reasonable employee would have found . . . [to be] materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (quotations omitted). The Court clarified, however, that "normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence." *Id.*

## III.  Analysis

### A.  Memon's Theories of Recovery

Memon alleges racial and religious discrimination. In its briefing and during discovery, Deloitte separates the two. That is appropriate in many cases. But in other cases, the lines between different kinds of discrimination may "not [be] bright." *St. Francis Coll. v. Al-Khajrazi*, 481 U.S. 604, 614 (1987) (Brennan, J., concurring). When a "plaintiff's race, religion, and national origin are commonly associated with one another, it is difficult, and unnecessary, to consider whether the various allegedly discriminatory incidents that plaintiff relies upon for his . . . claims clearly point to *either* race-, religion-, *or* national-origin-based discrimination." *Millin v. McClier Corp.*, No. 02 Civ. 6592(GEL), 2005 WL 351100, at *5 (S.D. N.Y. Feb. 14, 2005) (emphasis in original) (analyzing claims of a black Rastafarian from Jamaica); *Fraser v. N.Y.C. Bd. Of Educ. (Evander Childs High Sch.)*, No. 96 CIV 0625(SHS), 1998 WL 55170, at *3–4 (S.D. N.Y. Feb. 10, 1998) (assuming without deciding that claims of a Hebrew Israeli were for race, national origin, and religious discrimination).

20

Memon is a native of Pakistan and a Muslim.  He has withdrawn his national-origin discrimination claim.  But under the circumstances of this case, it is appropriate to recognize that Memon's claim of race and religious discrimination are intertwined.  Evidence of discrimination against Memon on one ground is, under the circumstances of this case, evidence of discrimination on the other.  Memon may assert a Title VII claim for racial discrimination even though he did not explicitly invoke this claim until his response to Deloitte's summary-judgment motion.

A plaintiff may "clarify the theories upon which she relies without expanding or otherwise altering the scope of the action in any meaningful manner," even in response to a motion for summary judgment, because doing so does not prejudice the defendant.  *Estate of Gaither ex rel. Gaither v. District of Columbia*, — F. Supp. 2d —, 2011 WL 677482, at *3–4 (D. D.C. 2011).  Memon clearly alleged a claim for racial discrimination under § 1981 and for religious and national origin discrimination in his original complaint.  (Docket Entry No. 1, ¶¶ 55–59).  As noted above, § 1981 and Title VII require the same kinds of proof to recover.  Deloitte is not prejudiced by Memon's clarification.

Deloitte also argues that Memon cannot assert a Title VII race discrimination claim, because he failed to exhaust his administrative remedies with respect to this claim.  When Memon filed his EEOC charge, he checked the boxes for retaliation and religious and national origin discrimination, but not racial discrimination.  In determining whether an allegation in a complaint falls within the scope of an EEOC charge, a court must "engage in fact-intensive analysis of the statement given by the plaintiff in the administrative charge, and look slightly beyond its four corners, to its substance rather than its label."  *Pacheco v. Mineta*, 448 F.3d 783, 789 (5th Cir. 2006).  The directive to construe EEOC charges liberally, *see, e.g.*, *Clark v. Kraft Foods, Inc.*, 18 F.3d 1278, 1280 n.7 (5th Cir. 1994), means that "courts will look beyond the scope of the charge's language to the scope of

the [administrative] investigation which can reasonably be expected to grow out of the charge." *Pacheco*, 448 F.3d at 789 n.9. But claims set forth in the EEOC charge do not exhaust claims in a subsequent lawsuit unless they are "like or related" the claims in the charge. *McClain v. Lufkin Indus., Inc.*, 519 F.3d 264, 273 (5th Cir. 2008) ("[T]he primary purpose of Title VII is to trigger the investigatory and conciliatory procedures of the EEOC, in an attempt to achieve non-judicial resolution of employment discrimination claims." (quoting *Pacheco*, 448 F.3d at 788–89 (5th Cir. 2006) (alterations omitted))). The requirement ensures that the EEOC is not "left in the dark concerning the substance of plaintiffs' claims." *See Stanley v. Univ. of Tex. Med. Branch, Galveston, Tex.*, 425 F. Supp. 2d 816, 823 (S.D. Tex. 2003) (holding that an allegation of race and sex discrimination did not exhaust a claim of harassment).

The record shows that under the applicable law, Memon administratively exhausted his race discrimination claim. Memon did not check the box for race discrimination, but he did check the box for national origin and religious discrimination. As noted above, in this case, claims of race, national origin, and religious discrimination are intertwined. *See St. Francis Coll.*, 481 U.S. at 614 (Brennan, J., concurring) ("[T]he line between discrimination based on ancestry or ethnic characteristics and discrimination based on place of nation of origin is not a bright one." (quotations, citations, and alterations omitted)). Memon's claims for each type of discrimination arise out of the same incidents. *See Daneshvar v. Graphic Tech., Inc.*, 18 F. Supp. 2d 1277, 1284 (D. Kan. 1998) (noting that "an investigation of plaintiff's national origin claims would necessarily include an investigation into potential race claims where, as here, the alleged underlying conduct is the same for either claim").

The administrative exhaustion requirement does not preclude Memon from asserting a race discrimination claim under Title VII. Memon's claims of racial discrimination under § 1981 and

racial and religious discrimination and retaliation under Title VII are all before this court.

**B.     Adverse Employment Actions**

Memon faults five employment actions by Deloitte: the way Mishan treated him on the PROFIT project; the requirement that he not perform Wazu in the Wal-Mart office bathrooms, the change in duties on the PROFIT project; rolling him off the PROFIT project; and firing him.  All except the job termination took place before Memon complained to anyone about his treatment.  As a result, only the termination decision can qualify as retaliatory.  *DeHart v. Baker Hughes Oilfield Operations, Inc.*, 214 F. App'x 437, 442 (5th Cir. 2007) (per curiam) (unpublished) (no retaliation when the adverse action took place before the plaintiff's protected activity); *Zaffuto v. City of Hammond*, 308 F.3d 485, 492 (5th Cir. 2002) (same); *Soledad v. U.S. Dep't of Treasury*, 304 F.3d 500, 507 (5th Cir. 2002) (same); *Casarez v. Burlington N./Santa Fe Co.*, 193 F.3d 334, 338–39 (5th Cir. 1999) (same).

Memon's job termination is clearly an actionable adverse employment action.  As explained below, the other four challenged employment actions are evidence relevant to Memon's claim that he was fired based on discrimination and retaliation.  But the other four actions are not themselves actionable adverse employment actions that can independently support recovery.

The first employment action Memon alleges is that Mishan treated him badly.  Memon asserts that he had to drive Mishan around Bentonville and that Mishan was rude, criticized his work, and called him "dog."  (Docket Entry No. 33, Ex. 2 at 258–270).  Memon does not remember how many times Mishan called him "dog," but says it was "more than three" times over the course of "a few days."  (*Id.* at 268–69).  In general, sporadic or isolated workplace interactions are not actionable ultimate employment decisions, as required for a race or religious discrimination claim, including a hostile work environment claim.  *See McCoy*, 492 F.3d at 559.  Title VII is not a

23

"general civility code," and employees must tolerate the "ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citations and quotations omitted).  Only when conduct is "so severe and pervasive that it destroys a protected class member's opportunity to succeed in the workplace" can a plaintiff obtain relief under Title VII.  *Shepard v. Comptroller of Pub. Accounts of the State of Tex.*, 168 F.3d 871, 874 (5th Cir. 1999) (quoting *Weller v. Citation Oil & Gas Corp.*, 84 F.3d 191, 194 (5th Cir. 1996); *see also Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 754 (1998) (requiring "a showing of severe or pervasive conduct" for a hostile environment claim).  For example, a continuing pattern of hostile comments  survives survive summary judgment; evidence of sporadic work-related criticisms does not.  *Compare EEOC v. WC & M Enters., Inc.*, 496 F.3d 393, 400–01 (5th Cir. 2007) (summary judgment was not warranted when a Muslim employee alleged that coworkers called him "Taliban" multiple times a day, called him "Arab" though he was Indian, and mocked his religious beliefs and practices, and a supervisor wrote that he was "acting like a Muslim extremist" in an official reprimand), *with Kang v. Bd. of Supervisors of La. State Univ.*, 75 F. App'x 974, 976–77 (5th Cir. 2003) (summary calendar) (holding that unjustified criticisms of an employee in front of coworkers does not create a hostile work environment).  The evidence as to Mishan's alleged treatment of Memon, taken in the light most favorable to Memon, falls short of the alleged mistreatment the courts have found necessary to preclude summary judgment.  Memon describes rude and insulting behavior, but that is not enough.  *See Butler v. Ysleta Indep. Sch. Dist.*, 161 F.3d 263, 270 (5th Cir. 1998) ("Contrary to the children's rhyme, all insults, like sticks and stones can hurt, but this does not mean that all insults are tortious."); *Soliz v. Assocs. in Med., P.A.*, Civ. A. No. H-06-2785, 2007 WL 2363304, at *5–6 (S.D. Tex. Aug.17, 2007) (holding that yelling at the plaintiff in front of other employees did not

24

create a hostile work environment).

Even if the behavior were frequent and oppressive enough, harassment by a coworker is not actionable unless the employee reports it to his supervisor. *Reine v. Honeywell Int'l Inc.*, 362 F. App'x 395, 397 (5th Cir. 2010) (citing *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 393, 393 & n.2 (5th Cir. 2007)). Memon admits he did not. (Docket Entry No. 33, Ex. 2 at 268 ("Q. Did you ever make any complaints to Mr. Furgason or anybody else in a position of authority at . . . Deloitte Consulting? A. No, sir, I did not."). Memon does not appear to contend that Mishan was his supervisor. (*See id.* at 134 ("Q. You've told us that Mr. Furgason was your supervisor — A. Yes, sir —"), 147 ("Q. And [Furgason] was your Supervisor? A. Yes, sir."), 363 ("Q. Now, who . . . was your supervisor at the time . . .? A. Mr. Furgason . . . ."); *see also id.* at 251("Conrad Mishan was a Lead on the Wal-Mart project in January, 2008 — correct? A. No, sir. He was not Lead.")).

The second employment action Memon asserts as discriminatory was the requirement that he not use the bathrooms at the Wal-Mart offices for Wazu. Memon does not appear to assert a claim for failing to accommodate his religious beliefs. Memon alleges that the objections to his religious practices of praying and performing Wazu at the office evidence discrimination on the basis of his religious beliefs, not that he was unable to comply with a work requirement because of a conflicting demand imposed by his religious practices. The directions that he find another office to use for prayers and Wazu are not in themselves adverse employment actions but are evidence of religious and race discrimination.

Memon asserts that he was demoted when he was redesignated as a team member instead of a team leader and rolled him off the PROFIT project, and that both were adverse employment actions. A demotion is a position that is "objectively worse," whether through traditional markers

25

such as lower pay, title, or grade, or more intangible markers, such as prestige, interest, or opportunities for advancement.  *Pickens v. Shell Tech. Ventures, Inc.*, 118 F. App'x 842, 848 (5th Cir. 2004) (citing *Sharp v. City of Houston*, 164 F.3d 923, 933 (5th Cir. 1999)).  An employee's subjective belief that a new position is less prestigious is insufficient to show an adverse action.  *Lee v. City of New Orleans*, 156 F. App'x 618, 619 (5th Cir. 2005) (per curiam) (unpublished); *Pegram*, 361 F.3d at 283.

Although the evidence is inconsistent, taking it in the light most favorable to Memon shows that the change in his responsibilities on the PROFIT project does not amount to a demotion that is an adverse employment action.[3]  Memon does not contend that his job title changed or that he was assigned a different rank or salary.  Deloitte and Memon focus most of their argument on whether Memon was ever a team leader or always a team member and the distinction between the two. Deloitte contends that Memon's claim that he was demoted from team leader to team member on the PROFIT project is undermined by his acknowledgement in his deposition that he was never a team member:

> Q.      You were initially a — a Team Lead at the Wal-Mart project for Deloitte Consulting — is that correct?
>
> A.      I — no, sir, I never assign as Team Lead.
>
> I was team member from beginning to end.  And they never give me a title that I am Team Lead.  And nobody came and told me that, "You — you are a Team Lead —"

---

[3]   Deloitte argues that Memon first alleged the removal from the team lead position in his response to the summary judgment motion and that this court should treat the argument as a motion to amend the complaint. Because the parties stated that no amendment to the pleadings would be necessary, this court did not set a deadline for amendment.  Deloitte asserts that Memon must satisfy Rule 16, which requires the amending party to show good cause why the amendment should be allowed.  Deloitte argues that Memon has not shown good cause for a late claim based on the "demotion" from team lead to team member.  There is no need to address this argument, because even if that change on the PROFIT project is before this court, the record shows, as a matter of law, that the change is not in itself actionable.

> Q.      Were you — you were a — Lead Consultant by — by the
> very title you had at Deloitte Consulting — right?
>
> A.      My — my title was Manage Consulting, yes, sir.
>
> But, you know, there — there's just time several project I
> noticed there was several lead consultant working as — as a team
> member; and that's what I was — one of them like that.

(Docket Entry No. 33, Ex. 2, at 157).  Memon concedes that lead consultants at Deloitte were not

necessarily team leaders on projects.  McGovern's testimony is similar:

> A.      ['Lead'] refers to his career level in the firm, not his role in
> the project.
>
> Q.      All right.  Well, would it make sense to have him as a lead
> career level and keep using him as a team member everywhere.
> Would that make sense?
>
> A.      That happens all the time.

(Docket Entry No. 30, Ex. H. at 35).[4]

The evidence shows that change in Memon's duties was that after leading two or two-and-a-

half workshops, he no longer led the workshops with Wal-Mart on the PROFIT project.  Such a

change is not an adverse employment action that supports a claim of discrimination under Title VII.

*Bubolts v. Residential Advantages, Inc.*, 523 F.3d 864, 868 (8th Cir.2008) (noting that "minor

changes in duties or working conditions, even unpalatable or unwelcome ones, [that] cause no

materially significant disadvantage" are not adverse employment actions that give rise to an

employment-discrimination claim); *Belt v. Ala. Historical Comm'n*, 181 F. App'x 763, 764-65 (11th

Cir. 2006) (holding that "minor changes to [the plaintiff's] job duties, including requiring that she

provide her . . . admission reports to her supervisor rather than transmit them directly to the

---

[4]      Furgason explained that Deloitte has since renamed the "lead" position "specialist master," a move
designed to "eliminate any confusion" about the role.  (Docket Entry No. 30, Ex. F at 69).

Montgomery office and temporarily removing her duty to order gift shop inventory" were not adverse employment actions); *Williams v. U.S. Dep't of Navy*, 149 F. App'x 264, 269–70 (5th Cir. 2005) (per curiam) (unpublished) (allegation of a one-week relocation and removal of 20 percent of job duties with no change in pay was not an adverse action); *Herrington v. Univ. of Tex. M.D. Anderson Cancer Ctr.*, No. H-09-0601, 2010 WL 4918975, at *8 (S.D. Tex. Nov. 24, 2010) (assigning team leader to note-taking duties on a single project was not an adverse employment action).

Memon points to a March 3, 2008 e-mail in which Shively characterizes the change in duties on the PROFIT project as a "demotion." (Docket Entry No. 33 at 16). The e-mail's subject is "EA Performance Concerns." (Docket Entry No. 33, Ex. 12). The relevant portion reads:

> Mohammed Memon - Lead - Tony Perroni - Marginal progress has been made to date. The short tenure at Lockheed, coupled with failure to pass interviews for prospective projects and demotion from team lead to team member at Walmart is a concern. If my memory serves me correctly, this is also the person that we have an Employee Relations issue on at t[h]is time.

(*Id.*). Shively's reference to the change in duties as a "demotion" does not make the change an "objectively worse" job that is actionable under Title VII. In light of the clear record evidence that the only change in Memon's duties before being rolled off the PROFIT project was that he no longer led workshops, which, as explained above, is not an adverse employment action, the e-mail does not raise a genuine issue of material fact.

It is a closer question whether rolling Memon off the PROFIT project is an adverse employment action. There is uncontroverted evidence that Deloitte consultants are frequently rolled off projects. (Docket Entry No. 30, Ex. C., ¶ 6). McGovern, the principal in charge of the PROFIT project was himself ultimately rolled off. (*Id.*, Ex. H at 52). "Workers are often assigned to work

on various projects within the scope of their employment." *Barnett v. Boeing Co.*, 306 F. App'x 875, 881 (5th Cir. 2009) (per curiam) (unpublished) (holding that project reassignment was not an adverse employment action even under the broader retaliation standard). Switching an employee from one project to another, without more, is not a basis for a Title VII claim. *See, e.g.*, *Herrington*, 2010 WL 4918975, at *8 (holding that removal of a project manager from a project was not an adverse employment action); *Hale v. Napolitano*, Civ. A. No. SA-08-CV-106-XR, 2009 WL 1507144, at *6 (W.D. Tex. May 28, 2009) (removal from a project, along with other actions, was not enough to show an adverse employment action under the post–*Burlington* standard for Title VII retaliation). On the other hand, Deloitte's own records state that Memon was rolled off the PROFIT project because his supervisors on the project and their counterparts at the client were dissatisfied with his work. But because there was no demotion, no change in title, and undisputed evidence that Memon was offered other projects at Deloitte, the record shows that the roll off was not an adverse employment action that can separately provide a basis for recovery, as opposed to serving as evidence of discrimination or retaliation.

Deloitte concedes that Memon's termination was an adverse employment action. *See, e.g.*, *McCoy*, 492 F.3d at 559. The circumstances and events during the PROFIT project are evidence of whether Deloitte's decision to fire Memon was discriminatory or retaliatory.

### 2.    Deloitte's Proffered Nondiscriminatory and Nonretaliatory Reason for Terminating Memon's Employment and the Evidence as to Pretext

It is undisputed that Deloitte proffered legitimate nondiscriminatory reasons for Memon's termination. Perroni testified that he decided to fire Memon because of performance problems, work absences, and Perroni's belief that Memon had been dishonest about his work attendance. The burden shifts to Memon to provide evidence that these reasons were pretextual.

29

Deloitte contends that summary judgment is appropriate on the discrimination claims, because Perroni alone made the decision to terminate Memon's employment and there is no evidence that he bore any religious or racial animus toward Memon. Perroni wrote the separation memorandum. (Docket Entry No. 30, Ex. F). Furgason and McGovern testified that they were not involved in deciding to fire Memon. (Docket Entry No. 30, Ex. F, at 76; Docket Entry No. 33, Ex. 5 at 10–11). This testimony is consistent with the separation memorandum, which Perroni wrote. But there is evidence that Furgason, who decided to remove Memon from the PROFIT project and wrote a negative evaluation of his work, was motivated by religious and racial animus. There is also evidence that Perroni considered Furgason's evaluation and the related problems with Memon's performance in deciding to fire him.

Memon's evaluation from the Lockheed Martin project, though not outstanding, stated that he met expectations. Furgason admits that Memon was the first Muslim he had encountered in the workplace and that he was ignorant of the religious practices of prayer or Wazu. The evidence contains uncontroverted evidence that Furgason received a complaint about Memon being in a "state of undress" in a Wal-Mart bathroom, but Furgason concedes he did not investigate the complaint. Memon asserts that Wazu does not require disrobing at all and that Furgason never told him the nature of the complaint about Memon's use of Wal-Mart's bathroom. Furgason refused to allow Memon to explain his practices to anyone at Wal-Mart and required him to leave work to practice his religious beliefs. Although Furgason maintained on the February 1 phone call that performance, not religion, was the reason for rolling Memon off the PROFIT project, Memon asserts that Furgason never told him about any performance problems before that phone call. Memon also testified that Vyasa told him that Memon would likely replace him as team leader days before Memon was rolled off, which, if believed, suggests that others involved in the project did not know

30

of any concerns about Memon's performance.  Finally, Furgason's comments on the February 1 phone call could be interpreted as at best expressing discomfort with Memon's religion.  *Drake v. Magnolia Mgmt. Corp.*, 265 F.3d 1059,  2001 WL 872866, at *1 ("This court has held that remarks suggesting bias can, along with other evidence of pretext, allow a plaintiff to withstand summary judgment.") (citing *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 225 (5th Cir. 2000)). Deloitte's contrary evidence does not eliminate fact issues about Furgason's motivation in rolling Memon off and giving him a negative evaluation.

The Supreme Court's decision in *Staub v. Proctor Hospital*, — S. Ct. —, 2011 WL 691244 (2011), clarifies that an employer may be liable under Title VII even though there is no evidence of bias on the part of the final decisionmaker.  *Staub* involved the Uniformed Services Employment and Reemployment Rights Act, 38 U.S.C. § 3411(a), not Title VII.  The Court noted that the statute is "very similar to Title VII."  *Staub*, 2011 WL 691244, at *4.  Both statutes prohibit adverse actions in which prohibited bias is "a motivating factor."  *Id.* (comparing 38 U.S.C. § 4311(a) with 42 U.S.C. § 2000e-2(m)).  The question in *Staub* was whether an employer could be liable when the employee responsible for the termination relied on a supervisor's animus-driven performance evaluation.  The Court held that "if a supervisor performs an act motivated by [illegal] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable."  *Id.* at *7 (emphasis in original; footnotes omitted).  The presence of another basis for termination, such as an independent investigation by the person who made the decision, does not necessarily save the employer from liability.  The Court explained that "the supervisor's biased report may remain a causal factor if the independent investigation takes it into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified."  *Id.* at *6.

31

Perroni admits that he was aware of Furgason's criticisms of Memon's "performance issues on the PROFIT project."  (Docket Entry No. 30, Ex. A, ¶ 5).  Perroni listed Memon's "general unsatisfactory performance" as one of the reasons for the decision to fire him.  (*Id.*, ¶ 7; *see also id.*, ¶ 9 ("I explained to Plaintiff that he failed to meet Deloitte Consulting's expectations of a Lead consultant both on and off the 'bench,' and, therefore, he was being terminated.")).  Although Deloitte also asserts that Memon's absences from the Houston office justified firing him, the record includes conflicting testimony about whether Memon was told that he could work from home as opposed to coming to the office.  Memon testified that he rarely went to the office between the Lockheed Martin and Wal-Mart projects and no one complained.  Memon also testified after he returned from the PROFIT project, Sparkman told him he did not need to be in the office if he had nothing to do there.  Memon denies that Perroni ever told him he needed to be in the office when he was on the bench.

Deloitte also asserts that Memon was dishonest about the amount of time he spent in the Houston office after the roll off.  But Memon denies inflating his office attendance in his conversations with Perroni.

Resolving the disputed testimony about Memon's absences from the Houston office requires credibility determinations that cannot be made on summary judgment.  These disputes are material to determining pretext.  *See Reeves*, 530 U.S. at 148 ("[A] plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.").

For similar reasons, Deloitte is not entitled to summary judgment on the retaliation claim. Memon had made several complaints that his experiences on the Wal-Mart project were discriminatory before he was fired.  Shively's March 3 e-mail notes that Memon had "an Employee

Relations issue."  As noted, the evidence of what Memon was told about the need for him to come to the Houston office after the roll off is conflicting.  Although there is no dispute that Memon only rarely reported to the Houston office, evidence in the record would allow the jury to question whether Deloitte in fact required office attendance by an employee on the bench and whether Memon was told that he could work from his home.  This evidence, combined with the dispute about Memon's interactions with Shively and Perroni, precludes summary judgment on the retaliation claim as well.

**IV.    Conclusion**

Deloitte's motion for summary judgment is denied.  Memon's retaliation and racial and religious discrimination claims under Title VII, along with his racial discrimination claim under § 1981, remain.  His state-law claims and his claim for national-origin discrimination under Title VII have been abandoned.

A status and scheduling conference is set for **April 8, 2011** at 8:30 a.m., in Courtroom 11-B.

SIGNED on March 17, 2011, at Houston, Texas.

Lee H. Rosenthal

United States District Judge

33